# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| SAILI PRADO, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) No. 17-0506-CV-W-BP |
| | ) |
| JACKSON COUNTY, MISSOURI, *et al.*, | ) |
| | ) |
| Defendant. | ) |

## <u>ORDER DENYING PLAINTIFFS' MOTION<br>FOR CLASS CERTIFICATION</u>

Pending is Plaintiffs' Motion to certify a class of inmates and detainees asserting claims related to the conditions of their confinement. (Doc. 53.) Defendant Jackson County opposes the motion, arguing Plaintiffs' claims are better suited for individual litigation. (Doc. 66.) The Court has considered the parties' arguments and now **DENIES** Plaintiffs' motion.

### I. BACKGROUND

Plaintiffs, Saili Prado and Jeremy Bass, on behalf of themselves and a putative class, allege Defendant Jackson County violated their constitutional rights while they were incarcerated at Jackson County Detention Center ("JCDC" or "the Jail"). (Doc. 30, ¶ 2.) Plaintiffs generally allege that while at JCDC they and the other members of the class were subject to inhumane conditions which posed unreasonable health and safety risks.

JCDC houses both pretrial detainees and inmates. Pretrial detainees may be incarcerated for as little as a few hours, whereas inmates may be housed at JCDC for over one year. The JCDC incarcerated population stays in one of three buildings: the Main Tower, the Jail Annex, or the Regional Corrections Center ("RCC"). Each building holds different populations of detainees for varying reasons and for various durations. Municipal inmates are typically housed in RCC, State

inmates are typically housed in the Main Tower, and the Kansas City Police Department inmates are typically housed in the Annex.  However, inmates may be transferred within a building or from one building to another for reasons of health, safety, welfare, or other reasons.

Plaintiff Saili Prado was incarcerated at JCDC from February 3, 2016, to May 25, 2016.  While at JCDC, Prado was relocated numerous times for health and safety reasons.  Prado was housed in modules J3F, J4G, J4E, 7B, 7D, J4A, J4H, J7A, and J7B.  Plaintiff Jeremy Bass was incarcerated at JCDC from August 16, 2017, to September 28, 2017.  Bass was housed on the second floors of A-Pod and B-Pod.

In their Second Amended Class Action Complaint, Plaintiffs allege that at JCDC the inmates endured unsafe and unsanitary conditions.  (*Id.* at ¶¶ 55–73.)  For example:

- the sinks and toilets were "inoperable and overflowing with water, human feces, human urine, and other raw sewage," (*Id.* at ¶¶ 55, 61);

- sewage would back-flow into toilets when flushed, such that Plaintiffs were exposed to and the cells smelled of human feces, human urine, and other raw sewage, (*Id.* at ¶¶ 60–62);

- Plaintiffs requested but were continually denied access to cleaning supplies, (*Id.* at ¶ 58); and

- there was "inadequate inmate supervision" and "[a]n insufficient number of on-duty staff to perform all of the necessary duties associated with living conditions in the inmate housing units," (*Id.* at ¶ 69).

Plaintiffs seek class certification on Counts IV, V, and VI.  Counts IV and V assert that the inhumane conditions at JCDC violated the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment, respectively; Count VI asserts a failure to supervise and train JCDC personnel to provide inmates with basic sanitation.  Plaintiffs propose a class consisting of "[a]ll persons who were pretrial detainees or inmates housed in the JCDC, and were or will be released from the JCDC on or after August 10, 2012."  (*Id.* at ¶ 14).

2

In support of their claims and their request for class certification, Plaintiffs offer a Grand Jury Report and an audit of JCDC completed by consulting company CRA, Inc. ("CRA"). Both the report and the audit were completed in 2017. The Grand Jury Report found that JCDC failed to properly manage its funding, failed to plan for safety and security, and failed to clean and maintain its facilities. In its audit, CRA found that JCDC had overcrowded housing, poor living and sanitation conditions, and minimal access to cleaning supplies. (*Id.* at ¶ 69). However, as discussed below, neither the report nor the audit demonstrates that each class member experienced unconstitutional conditions over the six-year period described in the class definition.

## II. DISCUSSION

Class certification is governed by Federal Rule of Civil Procedure 23. A district court retains discretion to certify a class if (1) all elements of Rule 23(a) are satisfied, and (2) the class qualifies under at least one category of Rule 23(b). Plaintiffs have the burden of showing that Rule 23 is met and that the class should be certified. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). This burden is met only if, "after a rigorous analysis," the Court is convinced Rule 23 is satisfied. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011)). This analysis entails "some overlap with the merits of the plaintiff's underlying claim," and "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart*, 131 S. Ct. at 2551–52 (quotation omitted); *Luiken*, 705 F.3d at 372. This means that the district court must probe behind the pleadings – not to resolve the merits, but to understand the facts that will be utilized to support the claims asserted. *Id.*; *see also Bennett v. Nucor Corp.*, 656 F.3d 802, 814 (8th Cir. 2011).

3

Plaintiffs' seek class certification under Rule 23(b)(3). The parties focus their discussion on Rule 23(a) issues of commonality and typicality, as well as Rule 23(b)(3) issues of predominance and superiority. The Court also limits its discussion to these issues.

### A. Rule 23(a)(2) – Commonality

To be certified, a class must meet the requirements of Rule 23(a). Those requirements are:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." *Wal-Mart*, 564 U.S. at 349. Plaintiffs must assert a "common contention … that is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Plaintiffs suggest the following common questions of law and fact exist:

(1) Whether Defendant's acts and/or omissions reflect deliberate indifference to the health and safety of detainees and inmates in violation of the United States Constitution;

(2) Whether Defendant's acts and/or omissions in the failure to adequately train and supervise its officers reflect deliberate indifference to the health and safety of detainees and inmates in violation of the United States Constitution;

(3) Whether the conditions at the JCDC amount to a violation of Constitutional standards; and

(4) Whether the Defendant knew, or should have known, about the unconstitutional conditions of the JCDC.

4

(Doc. 70, p. 18.)[1]  These questions are common in that they depend on common contentions, but "[w]hat matters to class certification . . . is not the raising of common 'questions' . . . but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis in original) (quotations omitted).  Similarly, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* at 349–50.

The proposed class is defined as "[a]ll persons who were pretrial detainees or inmates housed in the JCDC, and were or will be released from the JCDC on or after August 10, 2012." (Doc. 30, ¶ 14.)  The proposed class would span six years and include pretrial detainees, who may be detained for as little as a few hours, and inmates, who may be detained for over a year.  In addition, the class members were dispersed among three different buildings, and multiple cells within those buildings.  Plaintiffs suggest the proposed class can reasonably be estimated to be in the thousands.  (Doc. 55, p. 19.)  The Court concludes that Plaintiffs' evidence does not establish how the common questions they identify will solve all class members' claims, and as discussed below, the class's breadth diminishes any commonality in the class members' claims.

To support their arguments for class certification, Plaintiffs primarily rely on the CRA audit and the Grand Jury Report, but neither demonstrates that JCDC has been in a condition which has caused the same unconstitutional harm to all JCDC inmates for the past six years. The proposed class covers the entire three-building complex at the JCDC, without differentiating between buildings.  The class does not differentiate between modules within buildings, or cells within modules, or between various points in time.  Plaintiffs' evidence does not establish that the sanitary condition of one building (or module or cell) was the same as another.  In fact, the evidence

---

[1] All page numbers are those generated by the Court's CM/ECF system.

demonstrates that the conditions likely changed over time – or at least, Plaintiffs have not carried their burden of identifying evidence that would establish the conditions were the same for each building. Similarly, the CRA audit and the Grand Jury Report describe conditions at particular points in time and do not purport to describe conditions for the entire six-year period.

For instance, CRA's finding of overcrowding was based on statistics from 2017. (Doc. 55-2, p. 16–17.) Its finding of poor living conditions also related to 2017 and did not shed light on living conditions in previous years. (*Id.* at 18–20.) CRA toured JCDC and spoke with inmates during its time at the Jail. Some inmates stated the toilets had not worked properly for "an extended period of time," that certain showers had not worked "for months," and that some sinks had not worked properly for "a lengthy period of time." (*Id.*) Although these statements make references to poor living conditions in the past, they do not provide evidence of systematic unconstitutional conduct over the six-year period set forth in the class definition. The report contains broad language describing extensive inhumane conditions at JCDC, yet, the observations relied upon to reach those conclusions come from isolated instances. For example, the report found that "[i]n some housing units, one or more showers were not working." (*Id.* at 19.) It also found that "[w]ater leaks were noted in several locations causing wet slippery floors." (*Id.*) Yet, evidence of a broken shower or wet floor at one point in time or in one location does not mean that condition has persisted for six years or was experienced by all class members. CRA also interviewed Jail employees and found that most policies in place were not being followed at the time of the interviews, but it did not indicate whether policies were followed in previous years. (*Id.* at 17–18.) Moreover, when CRA described the poor living conditions it found at JCDC, it listed the specific pod or floor where it observed the condition. (Doc. 55-2, p. 13–14.) (*E.g.*, "Inmates from adjoining cells complained of flushed materials coming up in the other cell. Confirmed by

6

observation. (**Main tower pod 5G**)") (emphasis added.) This evidence may support a finding that inhumane conditions existed in some parts of the Jail, but it is insufficient for the Court to conclude from this evidence that inhumane conditions existed in every cell, module, and building of the Jail or that every class member experienced the alleged inhumane conditions.

The Grand Jury Report suffers from similar flaws. It found a systematic lack of funding at the Jail, but it did not suggest how or if the lack of funding caused the alleged unconstitutional conduct in this case. (Doc. 55-1.) The report states the "cleaning of inmate living spaces is not properly managed and as a result those spaces are dirty and inmate wellness is at risk." (*Id.* at 45.) It goes on to list various conditions the Grand Jury observed when it toured the jail, including:

> (i) standing water inside of inmate living spaces; (ii) shower curtains ripped off of hooks causing wet flooring; (iii) a broken toilet with trash in an occupied cell; (iv) filthy water fountains; (v) trash inside of inmate cells; (vi) discolored or dirty bed sheets; (vii) dirty bins used for holding clean laundry; (vii) carcasses from dead birds and trash in the outdoor recreation space on the top floor of the Tower; and (viii) the scattered, disorganized, and unsecure storing of inmate property.

(*Id.* at 46.) The report also includes pictures of the conditions. (*Id.* at 45–51.) Like the CRA report, this evidence may demonstrate the existence of inhumane conditions at the Jail, but it only does so as it relates to an individual cell or pod within JCDC and at the time the Grand Jury toured the Jail. The report does not demonstrate (or purport to demonstrate) that these conditions existed throughout the facility for the entire time period designated by the class definition, nor does it establish that each class member experienced those conditions during their time at the Jail.

Plaintiffs also allege that there is a "custom or policy of Defendant Jackson County to inadequately supervise and train its correctional officers." (Doc. 30, ¶ 135.) This allegation is necessary to impose liability on Jackson County. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (finding that local governing bodies can be sued where the alleged unconstitutional action implements or executes an official policy.) However, this allegation cannot

7

satisfy the commonality requirement. The class members' claims and injuries arise from allegedly being exposed to unconstitutional conditions in the Jail. Absent such exposure, the existence of the policy alone would not give rise to liability. Therefore, determining the existence of such a policy does not resolve which class members were exposed to unconstitutional conditions and thus does not "drive the resolution of the litigation" as required by *Wal-Mart*. *Wal-Mart*, 564 U.S. at 350.

Plaintiffs cite numerous District Court decisions in support of their claims. However, those decisions are distinguishable for several reasons. Most of the cases involve narrower, more discrete facts (and classes) than this case. For example, the decision in *Langley v. Coughlin* dealt with a class of inmates alleging unconstitutional conditions who were all housed in a single "special housing unit" at a correctional facility. *Langley v. Coughlin*, 715 F. Supp. 522 (S.D.N.Y. 1989). Similarly, in *Tyler v. Suffolk County*, the Court certified a class of inmates who were all housed within the same building and who were all denied access to a bathroom during the evening hours. *Tyler v. Suffolk Cty.*, 253 F.R.D. 8, 9 (D. Mass. 2008). In *Henderson v. Thomas*, the Court certified a class of HIV-positive prisoners who were all segregated from the general prison population based on their disability status. *Henderson v. Thomas*, 289 F.R.D. 506, 508 (M.D. Ala. 2012). In *Olson v. Brown*, all plaintiffs were all subject to the jail's policies of opening inmates' mail outside of their presence and denying inmates access to the jail's law library. *Olson v. Brown*, 284 F.R.D. 398, 403 (N.D. Ind. 2012). Further, in *Smentek v. Cook County*, the Court certified a class in which all members requested treatment for dental pain but were denied an examination by a health care professional. *Smentek v. Cook Cty.*, 2011 WL 13136965, at *1 (N.D. Ill. Aug. 17, 2011), *aff'd sub nom. Smentek v. Dart*, 683 F.3d 373 (7th Cir. 2012). Each of these classes were focused in terms of the conditions at issue and the time frame involved, such that each class

member could claim to have been exposed to the same conditions as all other class members. The facts of this case are much more broad and imprecise than those in the cases on which Plaintiffs rely.

Plaintiffs also cite several cases which involved requests for injunctive relief only, which typically raise less individual issues than cases seeking monetary relief. *See*, *e.g.*, *Parsons v. Ryan*, 754 F.3d 657, 662 (9th Cir. 2014); *Olson*, 284 F.R.D. at 402; *Hernandez v. Cty. Of Monterey*, 305 F.R.D. 132, 139 (N.D. Cal. 2015); *Hughes v. Judd*, 2013 WL 1821077, at *1 (M.D. Fla. Mar. 27, 2013), *report and recommendation adopted as modified*, 2013 WL 1810806 (M.D. Fla. Apr. 30, 2013). Other cases Plaintiffs cite have considerably smaller class sizes than this case or were certified for the purposes of settlement only. *See, e.g.*, *Langley*, 715 F. Supp. at 531 (250-member class); *Henderson*, 289 F.R.D. at 510 (80-member class); *Smentek*, 2011 WL 13136965, at *5 (200-member class); *Butler v. Suffolk Cty.*, 289 F.R.D. 80, 87 (E.D.N.Y. 2013) (163-member class); *Hughes v. Judd*, 2013 WL 1821077, at *22 (M.D. Fla. Mar. 27, 2013), *report and recommendation adopted as modified*, 2013 WL 1810806 (M.D. Fla. Apr. 30, 2013) (70–80-member class); *see Jones v. Gusman*, 296 F.R.D. 416 (E.D. La. 2013) (certified for settlement purposes). Lastly, Plaintiffs cite few cases which were amenable to subclasses, which is not the circumstance here. *See, e.g.*, *Langley*, 715 F. Supp. at 530; *see also Butler*, 289 F.R.D. at 98.

In sum, Plaintiffs have not shown that the conditions were so widespread throughout the facility over six years that all class members experienced the same unconstitutional, inhumane living conditions. Plaintiffs have presented evidence that, for instance, the toilets were inoperable pod 5G in the Main Tower in 2017. (Doc. 55-2, p. 9.) But this evidence does not establish whether the inmates housed in the Tower in 2015 were also harmed by inoperable toilets, whether detainees in the Main Tower at any other time were harmed, whether a detainee housed in the Main Tower

in 2017 for only a few hours was harmed by inoperable toilets, or whether a person in a different pod in the Main Tower in 2017 was exposed to the same conditions. These differences highlight the absence of commonality and make class certification improper. Plaintiffs have not demonstrated how class members with such divergent experiences suffered the same injury or that there is a common answer which would establish the unconstitutionality of JCDC's conditions and resolve all class members' claims. With the limited evidence proffered by Plaintiffs, the Court cannot conclude that unconstitutional conditions existed across the JCDC campus for the entire time period designated by the class definition.

### B. Rule 23(a)(3) – Typicality

For similar reasons, even if the commonality requirement were satisfied, Plaintiffs' proposed class presents problems with typicality. Rule 23(a) requires that the claims of the representative parties be typical of the claims of the class. *See, e.g.*, *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 608 (8th Cir. 1983). Typicality and commonality are related concepts. *General Telephone Co. of the SW v. Falcon*, 457 U.S. 147, 157–58 (1982). Typicality requires "a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." *Tate v. Weyerhaeuser Co.*, 723 F.2d 598, 608 (8th Cir. 1983), *cert. denied*, 469 U.S. 847 (1984).

Plaintiffs claim their legal theory is identical to that of the class – "that defendant's failure to provide safe and sanitary conditions at the JCDC violates Plaintiffs' and class members'" constitutional rights. (Doc. 55, p. 23.) However, as Plaintiffs point out, in addition to having the same legal theory, to establish typicality Plaintiffs must also prove "the class representatives' claims 'arise from the same event or course of conduct as the class claims.'" *Id.* (quoting *Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996)).

Plaintiffs fail to demonstrate how their claims arise from the same event or course of conduct as the class claims.  Plaintiffs' experiences of alleged inhumane conditions are limited to the time and location in which they were incarcerated.  Plaintiff Saili Prado was incarcerated at JCDC from February 3, 2016, to May 25, 2016.  While at JCDC, Prado was housed in modules J3F, J4G, J4E, 7B, 7D, J4A, J4H, J7A, and J7B.  Plaintiff Jeremy Bass was incarcerated at JCDC from August 16, 2017, to September 28, 2017.  Bass was housed on the second floors of A-Pod and B-Pod.  Plaintiffs' claims are typical of those housed in the same location during the same or similar time, but they do not reflect the thousands of other putative class members who were incarcerated for different lengths of time, at different points in time, and at different locations within JCDC.  Further, the Court is not aware of the experiences of other class members in other areas of the Jail.  Without this consistency, the Court cannot conclude that Plaintiffs' claims are typical of the proposed class.  *See, e.g.*, *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006) ("The presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry").

Although Plaintiffs are correct in stating that minor deviations in fact patterns will not preclude typicality, the deviations between proposed class members in this case is not minor.  For example, a pretrial detainee may have been housed in the Annex for two days in 2013, whereas an inmate may have been held in custody for one year in the Tower during 2017.  There is no evidence to conclude that each class member had similar experiences to Prado and Bass.  In addition, the conditions at JCDC were not static but changed over the six years encompassed by the class definition.  Such fact-intensive inquiries are not amenable to class resolution.  (*Id.* at 787–88) (finding "the individualized nature of all substantive due process inquiries, and plaintiffs' failure

11

to identify the specific policies under attack and nature of their federal statutory claims" does not promote efficiency or economy underlying class actions).

For these reasons, Plaintiffs claims are not typical of the putative class members' claims.

### C. Rule 23(b)

In addition to satisfying all elements of Rule 23(a), a class must qualify under at least one category of Rule 23(b). Plaintiffs seek class certification under Rule 23(b)(3), which requires:

(1) that common questions of law or fact predominate over any questions affecting only individual members, and

(2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

The Court concludes that Plaintiffs failed to satisfy Rule 23(b).

#### 1. Predominance

Assuming Plaintiffs' questions of fact or law are common within the meaning of Rule 23(a)(2), the common questions do not predominate over individual issues. Fed. R. Civ. P. 23(b)(3). Although the mere presence of individual issues does not automatically destroy predominance, the Court must compare common questions to individual questions to determine if the former predominate over the latter. *E.g.*, *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815–16 (7th Cir. 2012); *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007), cert. denied, 555 U.S. 1032 (2008); *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003); *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.3d 290, 298 (5th Cir. 2001). In conducting this comparison, the Court must focus particularly on "whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013). In addition, "the need for detailed and individual factual inquiries concerning the appropriate remedy

for any violation still weighs strongly against class certification." *In re St. Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008).

Plaintiffs argue that common questions predominate over individual issues because the proof necessary to establish the class claims will be the same for every class member. The Court disagrees. As discussed above, the evidence Plaintiffs present does not establish that all class members were subject to the same inhumane conditions. Viewing the evidence in the light most favorable to Plaintiffs, certain areas of the Jail suffered from unsanitary conditions. However, this evidence does not establish that the unsanitary conditions existed in all areas of the Jail. Therefore, there is no common evidence to prove Defendant's liability to all class members and the Court finds that individual issues predominate over common issues.

### 2. *Superiority*

Finally, Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." To determine whether a class action is superior to other available methods, Rule 23(b)(3) sets forth factors to consider, including:

(1) the class members' interests in individually controlling the prosecution or defense of separate actions;

(2) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(4) the likely difficulties in managing a class action.

As to the first factor, Plaintiffs argue that a class action is superior to individual litigation because the expense and burden of individual litigation would make it impossible for individual class members to bring claims against Defendant. (Doc. 55, p. 28). Plaintiffs claim each case would contain the same core liability question: whether Defendant's conduct violated Plaintiffs'

13

constitutional rights. *Id.* However, as mentioned above, the question of Defendant's liability to any particular class member is a highly individualized question. Each class member would be required to prove that his or her exposure to the conditions at JCDC was unconstitutional.

The second factor – the extent and nature of any litigation concerning the controversy already begun by or against class members – also favors individual adjudication. At least two cases with similar claims have already been filed against Defendant. *See Ayers v. Jackson County, Missouri, et al.* No. 17-cv-00187 (W.D. Mo.); *Riechmann v. Jackson County, Missouri et al.*, No. 17-cv-00309 (GAF) (W.D. Mo.). Those cases allege unconstitutional unsanitary conditions during distinct times at which plaintiffs were incarcerated at JCDC.

Finally, a class action is not the superior method of adjudication because there are likely significant difficulties in managing the class. For example, the issue of damages would require highly individualized determinations. The damage to any class member would require proof of where the inmate was housed, how long he or she was housed there, the timeframe during which she was incarcerated, and the conditions to which she was subject. Although Plaintiffs put forth the option of using a special master to manage damages, such procedure is not feasible due to the size of the class and the individual determinations required. Further, a jury would not be able to ascertain liability or the extent of damages without considering individual events involving each and every class member.

Therefore, a class action is not superior to other available methods of adjudication.

### III. CONCLUSION

For these reasons, the Motion for Class Certification (Doc. 53) is **DENIED**. Consistent with the Court's previous Order, (Doc. 72), granting the joint motion to stay deadlines pending

this ruling, the parties are directed to file an amended Scheduling Order within seven days.

**IT IS SO ORDERED.**

                                            /s/ Beth Phillips
                                            BETH PHILLIPS, JUDGE
DATE: November 6, 2018                  UNITED STATES DISTRICT COURT